**ED PETERS JEWELRY CO., INC., Plaintiff,**

v.

**C & J JEWELRY CO., INC., Anson, Inc., William Considine, Sr., Little Bay Realty Co., L.L.C., and Gary J. Jacobsen, Defendants.**

No. Civ.A. 94–210L.

United States District Court, D. Rhode Island.

June 2, 1999.

Robert C. Corrente, Hinckley, Allen & Snyder, Providence, RI, Sanford J. Davis, McGovern & Associates, Greenwich, CT, for plaintiffs.

Thomas C. Angelone, Hodosh, Spinella & Angelone, Providence, RI, James J. McGair, Providence, RI, for defendants.

### DECISION AND ORDER

LAGUEUX, Chief Judge.

Plaintiff Ed Peters Jewelry Co., Inc. ("EPJC") seeks to collect unpaid sales commissions owed by defendant Anson, Inc. ("Anson"), an insolvent and inoperative jewelry company. EPJC sold Anson products under a sales contract with that manufacturer. Expecting little satisfaction from its claims against the defunct

Anson, plaintiff now targets those it believes are responsible for Anson's failure to pay. These other defendants include two companies and two individuals: 1) C & J Jewelry Co., Inc. ("C & J"), the buyer of Anson's operating assets; 2) Little Bay Realty Co., L.L.C. ("Little Bay"), the buyer of Anson's real estate; 3) William Considine, Sr. ("Considine"), the sole director of Anson and a one-half owner of both C & J and Little Bay; and 4) Gary J. Jacobsen ("Jacobsen"), a former management employee of Anson and Considine's partner in the two entities that purchased Anson's assets. Four counts of plaintiff's Complaint remain, of which three are equitable claims and one legal. Following a trial, the Court submitted to the jury one legal count solely for the determination of liability and one equitable count on an advisory basis only. The Motions for Judgment as a Matter of Law proposed by two defendants on the legal count are now before the Court. The Court must also resolve the two equitable claims not submitted to the jury and the one equitable claim submitted to the jury on an advisory basis. For the reasons stated below, defendants' Motions for Judgment as a Matter of Law on the count submitted to the jury are granted. On the three equitable claims reserved for this Court's consideration, the Court finds in favor of all defendants.

### BACKGROUND

This Court functions as the finder of fact for the three equitable claims advanced by plaintiff at trial. Pursuant to the mandate of the Federal Rules of Civil Procedure, this Court makes the following fact findings based on the evidence produced by the parties during the five-day trial. *See* Fed.R.Civ.P. 52(a) (stating that following a bench trial the Court "shall find the facts specially and state separately its conclusions of law thereon"). Other specific findings of fact related to individual counts will be detailed within the discussions of those counts.

### I. The Anson–EPJC Relationship

Anson was a manufacturer of men's jewelry and writing instruments. While some Anson products were sold under the Anson name to retailers, other products were sold under the retailer's name. Ed Peters ("Peters") sold Anson products to retail stores for many years beginning in the early 1980s, though he was never an Anson employee. At first, Peters worked as a salaried sales agent for an independent distributor that sold Anson products to Tiffany Company ("Tiffany"), a prestigious retailer of luxury items. Tiffany was Anson's lifeline. As the manufacturer's largest customer, Tiffany produced sales of several millions of dollars annually. Peters' employer had an exclusive right to sell Anson products to Tiffany and received a fifteen percent sales commission on that account. Beginning in 1981, Peters was the primary sales representative for that relationship. In 1987, Peters purchased the Anson–Tiffany relationship from his former employer and formed his own business, plaintiff EPJC, to service the account. Sales of Anson products to Tiffany would soon account for more than ninety percent of EPJC's business.

Anson and EPJC entered into a formal sales agency agreement ("Sales Contract") on January 1, 1988. Under the terms of the Sales Contract, EPJC was granted the exclusive right to sell Anson products to Tiffany and would be paid a commission of ten percent of the gross sales to that retailer. The Sales Contract also allowed EPJC to act as a non-exclusive agent for sales of Anson products to other retailers and provided for a fifteen percent commission on most of such sales. The Sales Contract was due to expire on December 31, 1990, but the parties agreed to alter the terms of the arrangement in September 1989. At that time, they agreed to extend the deal through December 31, 1994 in exchange for a reduction of the commission rate on Tiffany sales from ten to seven and one-half percent.

In 1990 Anson began falling behind in its commission payments to EPJC. By the end of that year, Anson was $120,000 in arrears under the terms of the Sales Contract. Despite the growth of this debt over the next several years and the futility of several attempted compromises, EPJC continued to work on behalf of Anson into 1993. Weary of laboring without pay, in 1993 EPJC commenced an arbitration proceeding pursuant to the Sales Contract for the commissions due through October 22, 1993. An arbitrator awarded EPJC $451,426.03 for the commission arrearage. The Rhode Island Superior Court confirmed the award and entered a judgment for this amount against Anson on April 21, 1994. In February 1994 EPJC won a second arbitration award against Anson. This award, for lost profits from October 22, 1993 through the end of the Sales Contract, totaled $407,652.84. The Rhode Island Superior Court confirmed that award and entered a second judgment against Anson in favor of EPJC on November 20, 1995 for that amount.

## II. The Anson–Fleet Relationship

EPJC has been unable to collect any portion of these judgments because of Anson's severe fiscal difficulties. At the center of this financial turmoil is the relationship between Anson and its primary creditors Fleet National Bank and Fleet Credit Corporation (collectively, "Fleet"). In 1983, Anson survived a Chapter 11 reorganization to resume its manufacturing business. Only with Fleet's financing was the jewelry concern able to survive this crisis. The revolving lines of credit and other loans supplied by the bank for funding Anson's operations were secured by comprehensive liens on the debtor's assets.

Fleet loaned Anson millions of dollars through the 1980s. Despite this backing, Anson continued to struggle. On several occasions, Anson technically defaulted on its obligations to Fleet by failing to meet specific performance criteria mandated by credit agreements, yet Fleet never exercised its power to foreclose because of these managerial missteps. By the early 1990s, Fleet finally began to feel the sting of Anson's problems. In 1990, Fleet began charging-off portions of the Anson debt because of the company's declining sales and because of organizational problems identified by Fleet, such as the company's poor inventory controls. Fleet continued to charge-off portions of the Anson debt for several years and by August 1992, the bank had charged-off a total of $3.7 million.

In an attempt to provide the overleveraged manufacturer with some breathing room, Fleet restructured Anson's debts in 1990 and 1991. Over $4 million of Anson's debt was placed on non-accrual status, so that Anson could defer making payments during this period of financial difficulty. Unfortunately, these efforts were not enough to solve Anson's problems, so the company continued to lose money. Anson's net income, which had been negative in 1988 and 1989, remained in the red for 1990, 1991, 1992, and through July of 1993, the last point at which such tallies were taken.

According to a financial analysis performed by Fleet in October 1993, Anson was insolvent and had been so for several years. Fleet estimated that the company had a negative net worth of more than $6 million. Anson owed substantial sums to a number of trade creditors, but by far the largest liability on Anson's books was its debt to Fleet. By the fall of 1993, Anson owed Fleet over $11 million: $2.61 million on a revolving credit line for financing operations, $3.27 million on a real estate loan, and $5.15 million on the debt for which payments were deferred in 1990, including a deferral fee of $800,000.

Given Anson's inability to turn a profit, Fleet officials doubted that the company would ever be capable of servicing its debts and, therefore, they began contemplating the liquidation of Anson in 1992. That year, Fleet received an environmen-

tal liability analysis of Anson's real estate and learned that cleanup costs for the property would amount to no more than $100,000, a sum low enough to make the sale of the land possible. When Fleet contacted Anson officials in early 1993, the bankers were prepared to end Anson's financial dilemmas once and for all by selling the company. In an October 1993 internal memorandum prepared by a loan official responsible for the Anson relationship, the official explained that Fleet had explained to Considine and Jacobsen that "we were prepared to liquidate."

Its well of optimism finally tapped, Fleet declared Anson in default of its credit agreement with the bank. In a March 25, 1993 letter to the company, Fleet explained that Anson's failure to meet certain performance objectives constituted "an Event of Default under the Loan Agreement, which entitles Fleet to cease making Revolving Loans, to accelerate all Loans and to exercise Fleet's rights and remedies" under the agreement. The letter further explained that Fleet was willing to liquidate the company in order to recoup its outlays if no other resolution to Anson's perpetual difficulties could be fashioned. But the Anson management team, not yet prepared to strike its colors, rallied to meet the challenge. They countered Fleet's surrender notice by floating an idea to resuscitate the business.

## III. The Sale of Anson

The effort to salvage the jewelry maker was led by Considine and Jacobsen. Considine, the sole director of Anson, controlled all of the company's voting stock through his own holdings and those of his family's trust. Jacobsen was the operating head of Anson who had been recruited by Considine to shake up the company in the summer of 1992. The two men proposed to create two new companies to purchase the assets of Anson. One company would manage the real estate while the other would continue Anson's manufacturing business. The new entities would be the two halves of a new venture, with the operating company leasing its physical plant from the real estate company and paying rent. Under their plan, Considine and Jacobsen would jointly own the two new entities. Few visible changes to Anson's operations were planned for the new joint venture.

Considine and Jacobsen planned to satisfy some of Anson's trade creditors, but only those deemed to be essential to the new business. In their view, EPJC was not an essential link in the new business plan, so they never intended to assume Anson's debt to EPJC. The record is clear on this point: Considine and Jacobsen were aware that Anson was crippled by debt and they sought to construct a new operation that would be free of similar burdens. They both also knew that EPJC was unlikely to ever collect the sales commissions owed by Anson.

Fleet negotiated with Considine and Jacobsen from early 1993 through October of that year. The bank and the two men exchanged memos, held meetings, and swapped financial data in pursuit of a rescue formula that would work. Although Considine and Jacobsen initiated and steered much of the negotiations, Fleet was eager to find a solution to the financial mess short of liquidation. However, the record leaves no doubt that Fleet bargained for the best deal it could obtain. The lender had already lost millions of dollars to the jewelry maker's troubles and was anxious to guard what little hope it had left in recovering part of its investment. After months of haggling, the parties reached a mutually satisfactory agreement in October 1993.

The final deal adopted by the parties conformed in most of its essentials with the original plan proposed by Considine and Jacobsen. The men formed two new entities: the operating corporation C & J and the real estate holding company Little Bay. Fleet notified Anson on October 1, 1993 that it intended to conduct a secured party sale of Anson's operating assets.

The sale of this property to C & J was completed on October 22. In accordance with their agreement, Fleet did not seek competing bids for the operating assets because all parties were concerned that the demise of Anson would startle Tiffany, the irreplaceable client. Without its operating assets, Anson was lifeless. Yet the manufacturing work formerly performed under the Anson name continued without pause under the C & J name. EPJC was first notified of the Anson sale in October 1993 after the transfer to C & J. The new business quickly notified Tiffany of the transfer after the sale was completed. C & J officials assured the retailer that product quality would not be harmed and that C & J would be a more financially stable supplier. Fleet employees also contacted Tiffany to assure the retailer that the transaction and the new companies had the bank's blessings.

Several months later, in December 1993, the liquidation of Anson was completed when Fleet foreclosed on Anson's real estate and sold it to Little Bay. The property sale was publicly advertised, but Little Bay was the only bidder. Neither sale generated enough cash to extinguish Anson's obligations to Fleet. Even after the complete liquidation of all of Anson's valuable assets, the withered company's total debt to Fleet was nearly $8 million. Anson has never been able to pay any of this remaining debt.

In accordance with its promise to Considine and Jacobsen, Fleet released its liens on all of the former Anson property. But according to the rescue plan, Fleet was more than just the secured party seller, it also served as the buyers' financier. Fleet financing to the tune of $2.7 million combined with a $1 million capital infusion by Considine and Jacobsen allowed the two new companies to purchase the Anson assets. The bank immediately established security interests in the same operating assets and real estate, now owned by C & J and Little Bay. The equity capital was supplied equally by Considine and Jacobsen, with each contributing $500,000 and taking one-half ownership of each new company.

The purchase of Anson's operating assets proceeded according to plan. C & J paid Fleet $500,000 in cash. Of this amount, $300,000 was deposited in a Fleet account in the name of C & i for future capital expenditures by the company. Fleet loaned C & J approximately $1.2 million to cover the remainder of the sale price for the operating assets, including accounts receivable, inventory, and equipment, and took security interests in all of these. Additionally, C & J issued to Fleet warrants for C & J stock due to mature in 1998 with a nominal value of $500,000. Defendants' financial valuation expert estimated at trial that these warrants had a market value of $148,000 at the time of the transaction.

The real estate purchase was structured similarly. Little Bay paid Fleet $500,000 in cash, one-half of which was placed in a Fleet account in Little Bay's name to fund debt service on the property's mortgage, and the other half of which was applied to the $1.5 million purchase price of the land. Fleet financed the remainder of the transaction and took a mortgage on the property. In accordance with the new business plan, Little Bay leased the former Anson facility to C & J.

For his role in brokering the sale and negotiating Fleet's financing, Considine was paid a $200,000 consulting fee by the two new entities. Jacobsen did not receive a finder's fee. C & J granted Fleet one additional measure of protection from potential problems hidden within the deal. C & J agreed to indemnify the bank from liabilities arising from unpaid Anson creditors. Attorneys for the bank expressed some concern to the dealmakers early in the negotiations about the plan to pay only certain of the anxious Anson trade creditors. In separate written outlines of the deal prepared by Considine and Jacobsen, the debt owed EPJC was categorized as non-essential. Fleet presciently informed

the two men that this aspect of the plan might invite litigation.

## IV. Travel of the Lawsuit

Following the secured party sale of Anson's assets, EPJC was left holding two virtually worthless judgments against the former jewelry maker. Anson was now little more than a legal shell of a corporation. The manufacturer was submerged under $8 million of Fleet debt, owned no assets, and had no prospects for future manufacturing operations. Faced with this gloomy scenario, EPJC turned to the new proprietors of Anson's old business for satisfaction. In 1994, EPJC, with the two Superior Court judgments for nearly $860,000 in hand, filed the instant lawsuit against C & J, Little Bay, Considine, Jacobsen, Fleet, and Anson.

In the Complaint, plaintiff alleged that the sale of Anson's assets was nothing more than a scheme to defraud Anson's junior creditors, particularly EPJC. Plaintiff argued then and still argues now that defendants are liable for Anson's obligations and that the maneuvering to defeat the legitimate claim of EPJC violates state law. The Complaint originally alleged common law causes of action for tortious interference with contractual rights, breach of fiduciary duty, wrongful foreclosure, and successor liability as well as statutory causes of action under Rhode Island's bulk transfers and fraudulent conveyances laws.

Senior Judge Francis J. Boyle conducted a jury trial in this Court on these claims.[1] At the close of plaintiff's case, the court granted a motion for judgment as a matter of law from the bench in favor of all defendants on all counts. "The court essentially concluded that neither Peters nor other Anson unsecured creditors had been wronged by the private foreclosure sale, since Fleet had a legal right to foreclose on the encumbered Anson assets which were worth far less than the amount owed Fleet." *Ed Peters Jewelry Co., Inc. v. C & J Jewelry Co., Inc.*, 124 F.3d 252, 258 (1st Cir.1997). Plaintiff appealed. The United States Court of Appeals for the First Circuit affirmed Judge Boyle's decision in part and vacated it in part. The appellate panel reversed Judge Boyle's judgment as a matter of law with regard to the two counts based on alternative theories of successor liability, the count of tortious interference, and the count alleging breach of fiduciary duty. These counts were remanded to this Court for further proceedings. The Court of Appeals affirmed the judgment with respect to Fleet on all counts and with respect to the statutory claims against all defendants.

In 1998 this Court again conducted a jury trial on this matter, this time without Fleet as a defendant.[2] Four counts remained in the dispute. Count I alleged that C & J and Little Bay are liable for Anson's debts to EPJC under the "mere continuation" theory of successor liability. Count II alleged an alternative theory of successor liability premised on a fraudulent transfer of assets. Count III alleged that C & J, Considine, and Jacobsen tortiously interfered with EPJC's contract with Anson. Count IV alleged that Considine committed a breach of his fiduciary duty to Anson's creditors by participating in the dismemberment of the jewelry company.

At the close of all the evidence, defendants moved for judgment as a matter of law on all counts. The Court reserved ruling on the motion at that time to allow the jury to consider the case. However, before instructing the jury, the Court concluded that Counts I, II, and IV were

---

1. None of the parties to this litigation brought to Judge Boyle's attention that most of these claims are equitable in nature, as is discussed below.

2. Again, the parties failed to comprehend that three of the four claims are equitable in nature. This Court reached that conclusion sua sponte after hearing arguments on defendants' Motion for Judgment as a Matter of Law.

equitable claims and therefore were properly to be decided by the Court, not the jury. The Court exercised its discretion under Rule 39(c) of the Federal Rules of Civil Procedure to submit Count I to the jury as an advisory jury only. *See* Fed. R.Civ.P. 39(c). Therefore, the jury considered two questions: the liability of C & J, Considine, and Jacobsen on Count III, and the liability of C & J and Little Bay on Count I, but only as an advisory jury on the latter question.

On the tortious interference claim, the jury returned a split verdict. The jury concluded that C & J and Considine were both liable to plaintiff, but that Jacobsen was not. The advisory jury returned a verdict for plaintiff and against C & J and Little Bay on the successor liability claim based on "mere continuation." The Court must now decide three equitable claims (Counts I, II, and IV) as well as address defendants' Motions for Judgment as a Matter of Law on Count III.

### DISCUSSION

### I. Equitable Nature of Counts I, II, and IV

■ The reach of the Seventh Amendment's jury trial right extends to a federal district court presiding over a controversy based on diversity jurisdiction. *See Simler v. Conner*, 372 U.S. 221, 222, 83 S.Ct. 609, 9 L.Ed.2d 691 (1963). Accordingly, this Court must pay heed to the United States Supreme Court's admonition that "'any seeming curtailment of the right to a jury trial should be scrutinized with the utmost care.'" *Chauffeurs, Teamsters & Helpers Local No. 391 v. Terry*, 494 U.S. 558, 565, 110 S.Ct. 1339, 108 L.Ed.2d 519 (1990) (quoting *Dimick v. Schiedt*, 293 U.S. 474, 486, 55 S.Ct. 296, 79 L.Ed. 603 (1935)). However, the right to a jury trial in a civil action does not extend to a cause of action that sounds in equity. *See* U.S. Const. amend. VII (guaranteeing jury trials for "Suits at common law"); Fed.R.Civ.P. 39(a) (granting the trial court the power to determine that "a right of

trial by jury of some or all of those issues does not exist under the Constitution or statutes of the United States"); *Pernell v. Southall Realty*, 416 U.S. 363, 375, 94 S.Ct. 1723, 40 L.Ed.2d 198 (1974); *Gallagher v. Wilton Enters., Inc.*, 962 F.2d 120, 122 (1st Cir.1992).

■ Whether a litigant is entitled to a jury trial is a matter of federal law, even if the substance of the dispute is a matter of state law. *See Simler*, 372 U.S. at 222, 83 S.Ct. 609 ("[T]he characterization of that state-created claim as legal or equitable for purposes of whether a right to jury trial is indicated must be made by recourse to federal law."); *Gallagher*, 962 F.2d at 122. In order to characterize the cause of action as equitable or legal, a federal court normally must analyze the elements of the state law claim and its concomitant remedies. *See Gallagher*, 962 F.2d at 122. In the present action, however, an extensive analysis of the claims that were removed from the jury's consideration is unnecessary because prior decisions of the First Circuit firmly establish that claims based upon successor liability and breach of fiduciary duty are equitable in nature.

■ In the appeal of Judge Boyle's prior decision in this case, the First Circuit expressly declared that successor liability is an equitable action. *See Ed Peters Jewelry*, 124 F.3d at 267 ("[S]uccessor liability is an equitable doctrine, both in origin and nature."). Likewise, the First Circuit has held that "[a]ctions for breach of fiduciary duty, historically speaking, are almost uniformly actions 'in equity'—carrying with them no right to trial by jury." *In re Evangelist*, 760 F.2d 27, 29 (1st Cir.1985) (citing Restatement of Restitution, introductory note at 9 (1937)). Furthermore, in the controlling Rhode Island case on breach of a corporate director's duties to a corporation's creditors, the Rhode Island Supreme Court recognized the cause of action as an equitable one. *See Olney v.*

*Conanicut Land Co.,* 16 R.I. 597, 18 A. 181, 182 (1889).

This Court, therefore, determines that the successor liability and breach of fiduciary duty counts were properly removed from the jury's consideration. The use of an advisory jury on the question of successor liability under the "mere continuation" theory is a matter reserved to a trial court's discretion. *See Delman v. Federal Prods. Corp.,* 251 F.2d 123, 126 n. 2 (1st Cir.1958). An advisory jury does not relieve the Court of its duties to make findings of fact and to render the final decision. *See DeFelice v. American Int'l Life Assurance Co. of New York,* 112 F.3d 61, 65 (2d Cir.1997). Regardless of the advisory jury's recommendation, the trial court must use its discretion "to accept or reject, in whole or in part, the verdict of the jury." 9 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2335, at 211–12 (2d ed.1995) (collecting cases). With the decks cleared for action, the Court is now ready to resolve the real controversy in this long-simmering standoff.[3]

## II. Count I: Successor Liability Based on "Mere Continuation"

### A. Elements of the cause of action

Hornbook corporations law instructs that a corporation may purchase the assets of another without being held responsible for the seller's liabilities. *See Cranston Dressed Meat Co. v. Packers Outlet Co.,* 57 R.I. 345, 190 A. 29, 31 (1937); 3 James D. Cox & Thomas Lee Hazen, *Corporations* § 22.8, at 22.28 (1995) "[W]hen the combination is structured as a purchase-sale, absent special circumstances, the acquiring company is subject only to those liabilities it has agreed to assume."). However, like most hornbook rules, this one is not without exception. Courts of equity have long recognized that the purchasing company may be liable for the debts of the original corporation under certain circumstances. *See Cranston Dressed Meat Co.,* 190 A. at 31; *see also H.J. Baker & Bro., Inc. v. Orgonics, Inc.,* 554 A.2d 196, 204–05 (R.I.1989) (relying on *Jackson v. Diamond T. Trucking Co.,* 100 N.J.Super. 186, 241 A.2d 471, 474–77 (1968) (collecting cases)). Courts have labeled this potential buyer responsibility "successor liability." *See H.J. Baker & Bro.,* 554 A.2d at 204. A seller's debt may be foisted upon the buyer unwillingly according to several theories recognized in some states. Plaintiff has identified two of these theories: liability based on a fraudulent intent to hinder creditors and liability based on the "mere continuation" theory. Plaintiff argues that both bases are implicated in this case. The Court will address the latter basis for liability first.

The modern "mere continuation" test for successor liability found in Rhode Island law is rooted in the *Cranston Dressed Meat* case. In that decision, the Rhode Island Supreme Court held that " '[w]here a new corporation is merely a continuation or a reorganization of another, and the business or property of the old corporation has practically been absorbed by the new, the latter is responsible for the debts or liabilities of the former.' " *Cranston Dressed Meat Co.,* 190 A. at 31 (quoting an annotation of cases). The Rhode Island Supreme Court fleshed out the details of this cause of action in the *H.J. Baker* decision by adopting the five "persuasive criteria" for a "mere continuation" claim. *See H.J. Baker & Bro.,* 554 A.2d at 205. Following this approach, the court determines (1) whether there has been a transfer of corporate assets, (2) whether less than adequate consideration was paid for those assets, (3) whether the acquiring entity continues the divesting corporation's business, (4) whether there is at least one officer or director instrumental to the transaction who is common to both enti-

---

**3.** The parties have not directly addressed the issue of choice of law. However, because both parties, as well as the First Circuit, have largely relied on Rhode Island authorities on all issues remaining in this case, this Court will proceed by applying Rhode Island law.

ties, and (5) whether the divesting corporation is unable to satisfy its creditors because of the transfer. *See id.; see also Jackson,* 241 A.2d at 477 (listing factors). Courts have recognized that this determination is highly fact-dependant. *See Cranston Dressed Meat Co.,* 190 A. at 31.

 The second factor in the *H.J. Baker* test, adequacy of consideration, is hotly disputed in this case. Under Rhode Island law, adequacy of consideration is a question reserved for the trier of fact. *See Nisenzon v. Sadowski,* 689 A.2d 1037, 1043–45 (R.I.1997) (discussing adequacy of consideration in the fraudulent conveyance context); *see also Ed Peters Jewelry,* 124 F.3d at 271 (same). Adequate consideration is defined as "equal, or reasonably proportioned, to the value of that for which it is given," or as "[t]hat which is not so disproportionate as to shock our sense of that morality and fair dealing which should always characterize transactions between man and man." *Black's Law Dictionary* 39 (6th ed.1990).

### B. Findings of fact

The parties have presented a factual dispute over only one of the five criteria listed by the *H.J. Baker* court for a "mere continuation" claim. Defendants do not challenge plaintiff's assertion that there was a transfer of assets from Anson to C & J and Little Bay, that the two new entities continued the business of Anson, that Considine qualifies as an officer or director of both the old and new entities and that he played a key role in negotiating the transfer, and that Anson is not capable of paying EPJC. Given the clear evidence on these issues, nothing more need be said about them. The sole remaining front in the conflict over this count will be won through the factual contest on the adequacy of consideration criterion.

### 1. Fair market value of the assets

 No other effort at trial occupied more of the parties' time than their competing proffers on the adequacy of the consideration paid by C & J and Little Bay to Fleet for the Anson assets. In order to analyze this factor, the Court must separately consider the two sides of the consideration equation: the value of Anson's assets sold by Fleet and the amount paid for those assets by C & J and Little Bay.

Valuing the assets sold by Fleet is not a task easily accomplished by one untrained in the area of financial valuation. A multitude of factors, some objective, some subjective, play important roles in the number-crunching exercise. Defendants offered the testimony of a highly-qualified expert in the field of business valuation, Robert Reilly, to assist the Court in finding its way through the balance sheets and interest rate analyses. Based on Reilly's professional background and the lucidity of his valuation methodology, this Court finds his testimony highly credible and instructive. Plaintiff offered no expert testimony and failed on an exhaustive cross-examination to deflate the power of Reilly's expert opinion.

Reilly digested reams of Anson's financial data and measured the fair market value of that company's assets using three different income-based techniques widely accepted in the business valuation field. Reilly valued four types of Anson assets: 1) net operating assets, such as accounts receivable; 2) tangible personal property, such as equipment and inventory; 3) intangible personal property, such as trademarks; and 4) real estate. Based on the results of the three alternative methodologies he used, Reilly concluded that the value of the entire package of Anson assets purchased by C & J and Little Bay was $3 million.

During the process of constructing this final opinion, Reilly used several alternative methodologies in order to produce a range of possible fair market values. Reilly did not price the various assets individually and then aggregate the individual values. Each method he used aimed to value

all of the Anson assets as a bundle. Essentially, Reilly valued the package of assets by examining their future earning power as a group. Using historical financial data and management projections, Reilly calculated the value that potential investors would likely place on the Anson business as a whole. Based on these various methodologies, Reilly testified that he was confident that his final opinion represented an accurate fair market measure of the Anson assets sold in 1993.

Plaintiff attempts to undermine Reilly's expert opinion on the value of the Anson assets by proposing several alternative values based on various crumbs of financial data culled from disparate sources. Plaintiff's efforts are unconvincing. Not only does this attempt to price the assets lack a coherent methodology, relying as it does on an agglomeration of numbers from unrelated documents, but it misconstrues the import of several figures contained in the record.

Plaintiff strains the record most obviously by asserting that a measure of the value of the operating assets can be found in C & J's 1993 tax return, filed shortly after the purchase of those assets from Anson. C & J reported that the cost basis of these assets was slightly greater than $3 million. Plaintiff argues that this report is convincing evidence that the operating assets alone were worth $3 million when they were transferred from Fleet. However, as Reilly explained on cross-examination, the cost basis of assets for federal tax purposes has no relationship whatever to fair market value. It is more closely related to historical cost than it is to current market value. "Cost basis" is a technical term defined by the tax code and numerous federal regulations and is a creature of federal public policy, not of the marketplace. It has little relevance to this inquiry.

Plaintiff next turns for support to credit memoranda prepared by Fleet officials assessing the Anson dilemma. There also, plaintiff uncovers little to help its cause.

In a memorandum dated October 14, 1993, a Fleet credit executive, Michael Rogers, detailed Anson's financial history and the proposed sale of Anson's assets for the benefit of other bank officials involved in approving the sale to and financing for C & J and Little Bay. In a section entitled "Collateral Analysis," Rogers examined Anson's assets "[f]or purposes of valuing our collateral." Rogers explained in that document that the gross value of Anson's operating assets, as reported by the company's auditors, totaled $5.25 million as of August 31, 1993. Rogers next calculated the "discounted value" of these assets by applying a percentage factor to the gross value. This factor reduced the gross value of the assets to an amount of money Fleet would expect to receive for these items if they were sold in the marketplace. Rogers estimated the discounted value of the operating assets to be $2.1 million. Although plaintiff encourages the Court to adopt the gross value of the assets as reported in the memo, the discounted value would be far more appropriate if this Court found it necessary to rely on the Fleet estimates.

Plaintiff also urges the Court to adopt a $2.4 million value for the real estate acquired by Little Bay. A branch of Fleet valued the property at $2.4 million in March 1993. However, other officials at Fleet, including those who oversaw the foreclosure, valued the property at $1.78 million. Fleet sold the property at the foreclosure sale for $1.75 million. Significantly, the foreclosure sale was a publicly-advertised sale. Plaintiff produced no other evidence supporting its proposed valuation of the real estate.

Considering all of the evidence at trial, and after weighing the analyses of this evidence presented by counsel, this Court finds that the fair market value of the Anson assets transferred to C & J and Little Bay was $3.0 million at the time of the two sales. This Court finds the opinion testimony of defendants' expert to be right on the mark. The ultimate conclu-

sion reached by Reilly was based on solid methodologies explained to the Court in detail. In contrast, plaintiff fails to present a persuasive theory of valuation. Instead, plaintiff relies on a variety of sources without justifying the utility of those figures. Faced with conflicting estimates and a convincing expert, this Court has little trouble concluding that plaintiff failed to prove its case on this point by a preponderance of the evidence.

## 2. Consideration paid for the assets

The Court must compare the value of the assets sold to the amount of consideration paid for those assets by C & J and Little Bay. Defendants' expert testified that the consideration paid amounted to $3.288 million. Plaintiff argues that the consideration paid amounts to only $450,-000. Based on its review of the extensive evidence adduced at trial, this Court finds that the consideration paid amounted to nearly $3.3 million.

There is little dispute over the amount of cash transferred in the deal. C & J contributed $200,000 in cash equity for the purchase of the Anson operating assets. Little Bay contributed $250,000 in cash equity for the purchase of the real estate. In addition, C & J transferred $500,000 in stock warrants to Fleet. An important feature of the warrants allowed Fleet to put the securities back to C & J after a period of years at a fixed value. Defendants' expert calculated the present value of those securities at the time of the sale to be $148,000. This amount must be added into the total consideration package.

The real dispute between the parties involves the financing provided by Fleet for the purchases. Plaintiff argues that loans extended to C & J and Little Bay are merely a form of refinancing of the old Anson debt and therefore should not be counted in the consideration analysis. Defendants argue that financed portions of sales are universally categorized as consideration paid. In 1993, they argue, C & J and Little Bay were new corporations with no connections of any sort to Fleet or to Anson's indebtedness. Therefore, when those two new companies acquired Anson's assets, partially by borrowing from Fleet, the debts they incurred were new obligations unrelated to Anson. This Court agrees with that view.

C & J and Little Bay were not indebted to Fleet prior to the purchase of Anson's assets. They incurred new debt in order to finance the purchase. This new debt could have been obtained from any number of commercial lenders, but it was provided by Fleet. As legal entities wholly separate from Anson, C & J and Little Bay were under no obligations to repay debts owed Fleet merely because they purchased Anson's assets. Such an obligation could arise only if these companies are judged to be "successors" under a theory of successor liability. However, it cannot be assumed for the purposes of determining successor liability that these two newly-formed companies were responsible for Anson's debts. That would be putting the cart before the horse.

Plaintiff incorrectly argues that this Court is bound by the First Circuit's decision in *Ed Peters Jewelry* to disregard the new loans granted by Fleet when calculating the amount of consideration paid by C & J and Little Bay. The First Circuit's decision must be understood within the context of that appeal's procedural posture. In that decision, the Court of Appeals reviewed the trial court's grant of judgment as a matter of law in favor of the defendants. The ruling of the appellate panel merely explained what was improper for a trial court to find as a matter of law. This is clear from the actual language used by the Court of Appeals: "Since the 'new' Fleet loans cannot count as 'consideration,' *at least as a matter of law,* C & J and Little Bay paid a combined total of only $1 million in additional cash consideration." *Ed Peters Jewelry,* 124 F.3d at 270–71 (emphasis added). Of course, the First Circuit was not commanding the trial court to make a particular finding of fact on the

amount of consideration paid, since it did not have the benefit of defendants, evidence before it. Nor did the Court of Appeals have an obligation to find the facts, as does this Court. The task before the Court of Appeals was not the calculation of the consideration paid Fleet, rather, it was the determination of whether the trial court erred in concluding that as a matter of law the consideration paid was adequate. *See Ed Peters Jewelry,* 124 F.3d at 271 ("At these minimal levels, adequacy of consideration presents an issue for the factfinder."). With such an incomplete record before it, and considering the appellate posture of the case, it cannot be maintained that the Court of Appeals determined the amount of consideration paid to Fleet, an exercise of fact-finding normally reserved to the trial court. *See Pullman–Standard v. Swint,* 456 U.S. 273, 291–92, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982) (" '[F]actfinding is the basic responsibility of district courts, rather than appellate courts.' ") (quoting *DeMarco v. United States,* 415 U.S. 449, 450, 94 S.Ct. 1185, 39 L.Ed.2d 501 (1974)). The First Circuit itself has warned that "[a]bsent special circumstances ... appellate fact-finding is permissible only when no other resolution of a factbound question would, on the compiled record, be sustainable." *Dedham Water Co., Inc. v. Cumberland Farms Dairy, Inc.,* 972 F.2d 453, 463 (1st Cir.1992). Therefore, this Court, as the factfinder for this equitable claim, is not bound by the discussion of consideration by the Court of Appeals in the *Ed Peters Jewelry* decision. *See id.* ("Because the factual issue to which appellant gestures was merely discussed, not decided, in the earlier appeal, the district court was not bound to accept the proposition.").

Based upon the evidence presented at trial, this Court finds that C & J and Little Bay provided Fleet with the following consideration. C & J contributed stock warrants worth $148,000 at the time of the transaction, $200,000 in cash equity, and $1,399,085.55 financed by Fleet. Little Bay contributed $250,000 in cash equity

and $1.5 million financed by Fleet. In total, the two companies paid consideration of $3.29 million.

## C. Application of the facts to the legal standard

Plaintiff has failed to carry its burden of demonstrating inadequate consideration, and with this failure, the cause of action for successor liability based on "mere continuation" dies on the vine. The record demonstrates that consideration of $3.29 million was paid for assets worth in the neighborhood of $3.0 million. The proof of the pudding is that Fleet thought that this was the best deal it could make to minimize its losses. If the bank had liquidated Anson the assets would have been worth even less and Fleet would have taken a bigger loss. Clearly, it is within this Court's discretion as the trier of fact to conclude that ample consideration supported the transfer of Anson's assets from Fleet to C & J and Little Bay. Therefore, on Count I of the Complaint, judgment shall enter for defendants C & J and Little Bay.

## III. Count II: Successor Liability Based on Fraud

Plaintiff proposes an alternative basis for holding defendants liable for Anson's debts. According to this second theory of successor liability, C & J and Little Bay may be held liable if Anson's assets were transferred with the intent to defraud creditors. Plaintiff correctly notes that the Court of Appeals in the *Ed Peters Jewelry* decision recognized actual fraud as a basis for successor liability. *See Ed Peters Jewelry,* 124 F.3d at 271–72. However, this Court has identified two reasons, one legal and one factual, for concluding that plaintiff is not entitled to a judgment on this equitable claim. Either of these reasons is independently sufficient to defeat plaintiff's effort to hold defendants C & J and Little Bay liable for Anson's obligations.

## A. Elements of the cause of action

Some courts have recognized a successor liability cause of action based upon fraud, independent of the "mere continuation" theory. *See id.* (citing cases from several states). According to the Court of Appeals, successor liability may be imposed when the parties transfer assets with the specific intent to defraud creditors. *See id.* The Court cited with approval a Massachusetts state court decision that explains that adequacy of consideration is irrelevant to the successor liability cause of action alleging fraud. *See id.* (citing *Joseph P. Manning Co. v. Shinopoulos*, 317 Mass. 97, 56 N.E.2d 869, 870 (1944)). However, there is some authority contradicting that view. *See* 3 Cox & Hazen, *supra*, § 22.8, at 22.30 ("Thus, when the successor corporation acquires the predecessor's assets for nominal consideration and continues its operations under the same management, the court can easily conclude the transfer was a fraud on creditors.").

Unable to find a single Rhode Island decision setting forth the elements of a successor liability cause of action based on fraud, this Court turns to the most comparable law it can locate for guidance in defining the contours of this action. In cases involving fraudulent conveyances by debtors, courts have explained that a creditor of the divesting debtor may not recover even where there has been a fraudulent transfer if the creditor cannot demonstrate that the transfer resulted in a diminution of the assets available to creditors. *See Richman v. Leiser*, 18 Mass.App.Ct. 308, 465 N.E.2d 796, 798 (1984) ("[T]here must also be a resulting diminution in the assets of the debtor available to creditors."); *Stauffer v. Stauffer*, 465 Pa. 558, 351 A.2d 236, 245 (1976) ("Since [judgment creditor] could not have reached the property before the conveyance, it follows that the conveyance itself could not have been fraudulent as to him."). This rule is logically sound, for "[i]t is not a fraud in contemplation of law to deprive one of that to which he has no right." *C.I.T. Corp. v. Flint*, 333 Pa. 350, 5 A.2d 126, 129 (1939). Such a consideration is an entirely appropriate one for a court charged with weighing the equities of a dispute. After all, "[e]quity looks to the substance and not merely to the form." *Young v. Higbee Co.*, 324 U.S. 204, 209, 65 S.Ct. 594, 89 L.Ed. 890 (1945). It would be inequitable to award plaintiff something out of nothing. Plaintiff is not entitled to an award merely because it can prove the technical elements of an action, but cannot prove that defendants actually caused it demonstrable harm. Therefore, this Court will carefully consider the causation element of this claim. But before addressing the strength of plaintiff's evidence, the Court will first explain its legal rationale for concluding that plaintiff cannot prevail on this claim.

## B. Rhode Island law does not recognize the cause of action

■ The Court of Appeals in *Ed Peters Jewelry* concluded that the trial court improvidently granted defendants' motion for judgment as a matter of law on this fraud count. In doing so, the Court identified evidence from which a trier of fact might conclude that Considine and Jacobsen "entered into the asset transfer with the specific intent to rid the business of all indebtedness due entities not essential to its future viability, including in particular the Peters sales commissions." *Ed. Peters Jewelry*, 124 F.3d at 272. Certainly, some evidence in the record does raise a question of fact as to fraudulent intent. Particularly important are the memos from Considine and Jacobsen explaining to Fleet executives that the transfer of assets they planned would result in freeing the new companies of the debt owed EPJC.

However, this Court is unable to locate a single Rhode Island decision that expressly adopts the fraud theory of successor liability. In none of the cases cited in the *Ed Peters Jewelry* decision does the Rhode Island Supreme Court hold that a defen-

dant may be liable as a successor under any theory other than the "mere continuation" doctrine. In *H.J. Baker,* only the "mere continuation" theory was upheld as a proper basis for liability. *See H.J. Baker & Bro.,* 554 A.2d at 205 (declining to make any holding on the legal merits of the fraud-based claim). Although the *H.J. Baker* Court described the "mere continuation" test as "a[n] exception" to the nonassumption rule, and not "the" exception, that rather innocuous choice of article hardly provides authority for importing into the law of the state a previously unrecognized theory of successor liability. *See id.* Nor does the Cranston Dressed Meat case provide any authority for recognizing the fraud test under Rhode Island law. Although the Court in that case extensively discussed liability for a defendant corporation when that corporation is " 'merely a continuation or a reorganization of another,' " the Court did not discuss liability springing solely from a fraudulent transfer. *Cranston Dressed Meat Co.,* 190 A. at 31 (quoting an annotation of cases). In an introductory sentence, that Court did explain the general rule that a corporation that purchases the assets of another may do so "without becoming liable for the latter's debts and obligations in the absence of fraud, contract, or statute to the contrary." *Id.* Yet, the Court wrote nothing more of fraud in that decision. No intent to establish an independent cause of action can be gleaned from this general statement that fraud may undo a corporate transaction. Furthermore, the equitable role of a fraud inquiry in successor liability cases is explained by the Rhode Island Supreme Court's analysis in the *Casey v. San–Lee Realty, Inc.,* 623 A.2d 16 (R.I. 1993), in which the Court demonstrated that while fraud may be a factor considered by a court faced with a "mere continuation" claim, it does not supply the court with a self-sufficient basis for liability.

Significantly, the most recent Rhode Island Supreme Court decision on the subject of successor liability, *Casey v. San–Lee Realty,* makes no mention of the fraud theory as an independent basis for liability. *See id.* at 18–19. In fact, the *Casey* Court discussed the fraudulent intent of a defendant only within the context of the "mere continuation" rule. *See id.* In its application of the five *H.J. Baker* factors for determining successor liability, the *Casey* Court examined whether the defendant had a fraudulent intent to transfer assets for less than adequate consideration. *See id.* at 19. The Court used fraud as a general equitable consideration to be examined when weighing the merits of a plaintiff's successor liability claim, not as an independent basis for liability. It is instructive that despite the existence of some evidence of fraud in that case, the *Casey* Court did not even mention fraud as a separate foundation for successor liability. The Court explained only the "mere continuation" test and cited only to *H.J. Baker* and its classic description of that test. Had the fraud theory been a recognized method of establishing successor liability in Rhode Island, the facts of *Casey* would have provided the Rhode Island Supreme Court an obvious opportunity to apply that rule. But the *Casey* Court did not address the fraud theory because that cause of action does not exist under Rhode Island law. Therefore, Count II of the complaint fails as a matter of law. Because the Court of Appeals *assumed* that such a cause of action is tenable under Rhode Island law, this Court will proceed with an analysis of the evidence relating to that claim. However, this Court's determination that the cause of action based on fraud is of illegitimate provenance in Rhode Island is sufficient to defeat Count II. Nevertheless, the Court will present an alternative basis for denying plaintiff a recovery on this count.

### C. Findings of fact

█ The parties provided contradictory evidence of fraudulent intent at trial. However, the fate of this claim hangs on a question of fact wholly separate from fraudulent intent: EPJC's ability to collect

on its debt from Anson. The evidence adduced at trial demonstrates that EPJC had no hope of ever recovering from Anson any of the commissions that were due. This unavoidable fact is fatal to plaintiff's effort.

By 1993, the Anson debt to Fleet totaled over $11 million. By anyone's estimate, the value of Anson's assets amounted to less than half of that sum. EPJC's debt was subordinated to Fleet's debt, which was protected by comprehensive security interests in all of Anson's property. In early 1993, Fleet executives planned to sell Anson as the only foreseeable exit strategy for their lending predicament. Fleet was not alone in its frustration with Anson, for the manufacturer had refused to pay EPJC for many months. Anson's income stream was inadequate to service the EPJC debt. Anson didn't pay because it couldn't. The manufacturer recorded net losses for each fiscal year from 1988 through 1992 and for the first seven months of 1993, the last point at which the company calculated net income.

Given this bleak financial landscape, under no circumstances would EPJC have recouped its debt. Anson was insolvent. Bank analysts and management alike predicted continued failure under the then-existing business structure. Therefore, EPJC could not have ever been paid, either through current revenues, which were negative, or by seizing a portion of Anson's assets, which were encumbered by Fleet in their entirety.

### D. Application of the facts to the legal standard

Assuming arguendo that a cause of action for successor liability based on fraud exists under Rhode Island law, plaintiff's proof lacks the punch needed to prevail. The failure in plaintiff's case is that it cannot demonstrate that the transfer of assets deprived it of anything. Although it is true that Anson now does not have sufficient assets to satisfy even a small portion of the EPJC debt, the record is

clear that even before the transfers, EPJC was hopelessly subordinated to Fleet. Liquidation of Anson was a very real possibility in early 1993 according to Fleet's initial analysis of the manufacturer's troubles. Had Fleet taken that course, EPJC would have received nothing given Fleet's status as a substantially undersecured creditor. Plaintiff is in no worse position today than it was in before the transfers. Prior to the sale of the operating assets in October 1993, EPJC had no legal right to any of Anson's assets, only Fleet had such a right. Given the extent of Anson's debt to the bank, EPJC's place in the pecking order of creditors was highly unlikely ever to change. The transfer of assets to C & J and Little Bay had no effect on EPJC's ability to collect on its debt because even without the transfers, EPJC never would have recovered from Anson. This Court's equitable powers will not be used to conjure up something out of nothing. Fleet's loss is not EPJC's gain. Therefore, because of this factual impossibility, plaintiff cannot recover on Count II. Judgment shall enter for defendants C & J and Little Bay on that count.

### IV: Breach of Fiduciary Duty

#### Elements of the cause of action

It is axiomatic in the law of corporations that corporate directors and officers owe a fiduciary duty to the corporation they serve. *See Olney v. Conanicut Land Co.*, 16 R.I. 597, 18 A. 181, 182 (1889). While the parameters of this duty are often difficult to map with precision, the gravitas of this duty is undeniable. Chief Judge Cardozo most eloquently expressed the nature of fiduciary duty in *Meinhard v. Salmon*, 249 N.Y. 458, 164 N.E. 545 (1928):

> Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the marketplace. Not honesty

alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. *Id.* at 546. The Rhode Island Supreme Court has explained that this duty imposes upon the fiduciary the obligation to act in the utmost good faith and to place the interests of the corporation before his or her own personal interests. *See Eaton v. Robinson,* 19 R.I. 146, 31 A. 1058, 1058 (1895). In more concrete terms, the corporate director's fiduciary duty has been held to prevent the taking of a corporate opportunity for personal gain. *See National Credit Union Admin. Bd. v. Regine,* 749 F.Supp. 401, 414 (D.R.I.1990). This duty also prohibits a fiduciary from acting "when he has an individual interest in the subject matter or when his interest is in conflict with that of the person for whom he acts" without first gaining that person's consent to so act. *Point Trap Co. v. Manchester,* 98 R.I. 49, 199 A.2d 592, 596 (1964). Like the trustee, the fiduciary may not sell property entrusted to him or her for personal benefit and to the detriment of the corporation and its shareholders. *See id.* (applying the principle of trusts to the corporate fiduciary context); *Stephens v. Dubois,* 31 R.I. 138, 76 A. 656, 658 (1910) (establishing the trust law principle). However, "[a] breach of fiduciary duty need not amount to a conversion in order to be actionable." *Ed Peters Jewelry,* 124 F.3d at 276.

██ This duty is most commonly enforced against directors on behalf of a corporation. Nevertheless, the law expands the duty to protect creditors of the corporation as well. *See Olney,* 18 A. at 181. The fiduciary duty owed to creditors is particularly acute when the total debts of the corporation exceed the value of the corporation's assets. The Rhode Island Supreme Court in the Olney case explained that "where the corporation becomes insolvent, and the stockholders have no longer a substantial interest in the property of the corporation, directors should be regarded as *trustees of the cred-*

*itors to whom the property of the corporation must go."* *Id.* (emphasis added).

██ Equitable remedies are available to a plaintiff who has been wronged by a breach of fiduciary duty. A fiduciary who personally benefits to the detriment of the corporation to which he or she owes a duty may be required to disgorge any profits enjoyed as a result of that breach. *See* Restatement (Second) of Torts § 874 cmt.b (1979). Such profits may be placed in a constructive trust for the benefit of those who were harmed. *See Matarese v. Calise,* 111 R.I. 551, 305 A.2d 112, 119 (1973) (applying the constructive trust remedy where " 'one who occupies a fiduciary or confidential relation to another in respect to business ... acquires a title or interest in the subject-matter of the transaction antagonistic to that of his correlate' ") (quoting *State Lumber Co. v. Cuddigan,* 51 R.I. 69, 150 A. 760, 761 (1930)). A plaintiff may also recover tort damages "for harm caused by the breach of a duty arising from the relation" according to normal tort rules that govern proof of claims, including the requirement of causation. Restatement (Second) of Torts § 874 cmt.b.

### B. Findings of fact

Many of the facts underlying plaintiff's breach of fiduciary duty claim are undisputed. Considine, the sole director of Anson, in October 1993 secured for himself a $200,000 consulting fee for helping to arrange the foreclosure and sale of Anson's assets. Although that transfer effectively ended Anson's ability to continue as a manufacturing concern, it allowed Considine to retain his interest in the Anson assets through his control of C & J and Little Bay. This favorable result from Considine's perspective was no accident. Considine actively participated in the negotiations with Fleet to arrange this predetermined sale to C & J and Little Bay. In fact, in May 1993 Considine penned the earliest written proposal to Fleet for a reorganization of Anson. Considine sug-

gested that if Fleet would foreclose on the Anson assets and sell them to a new company formed by Considine, he would infuse new equity into that company. The proposal expressly contemplated leaving behind certain subordinated creditors like EPJC. This is essentially what Fleet agreed to in the fall of 1993. It is clear that in his May 1993 proposal, Considine was representing himself and not the interests of Anson or its creditors. However, plaintiff presented no credible evidence at trial that it suffered damages as a result of Considine's behavior.

## C. Application of the facts to the legal standard

■ Under Rhode Island's formulation of the duty owed by corporate directors to creditors, there was no breach based on the particular facts of this case. Considine did not owe EPJC a fiduciary duty, because EPJC was not a creditor "to whom the property of the corporation must go." *See Olney*, 18 A. at 181. At all relevant times, only one creditor qualified for that protection, the highly undersecured Fleet. Under no factual scenario could EPJC have recovered any of Anson's assets given Fleet's comprehensive security interests and Anson's crippling debts to the bank. Only Fleet was a creditor "to whom the property of the corporation must go," and, therefore only Fleet was owed Considine's fiduciary duty to conserve those assets. The bank, as an eager and powerful participant in the sale of Anson, consented to Considine's actions and waived any claim of breach of fiduciary duty arising from the transaction. Although this is a unique factual circumstance, at least one other court has recognized that an unsecured creditor may not leapfrog a secured creditor via a breach of fiduciary duty claim against a director. *See Heimbinder v. Berkovitz*, 175 Misc.2d 808, 670 N.Y.S.2d 301, 307 (Sup.Ct.1998) ("[T]he creditor's remedy is limited to reaching the assets which would have been available to satisfy his or her judgment if there had been no conveyance."). Plaintiff's claim against Considine for breach of fiduciary duty fails as a matter of law.

■ Even if the Court were to assume the existence of a fiduciary duty owed by Considine to EPJC, plaintiff may not recover against Considine under Count IV. Plaintiff has failed entirely to prove that any of Considine's alleged breaches caused EPJC damage or that EPJC even suffered any damages. Receipt of the consulting fee may have constituted a breach of fiduciary duty, but the breach only harmed Fleet. As this Court has already explained, under no scenario of restructuring the Anson business could EPJC have hoped to collect on its judgments given the uncontroverted fact that Anson owed Fleet many millions of dollars more than its business was worth. To the extent that Considine depleted the assets of Anson, usurped a corporate opportunity, or failed to adequately represent Anson's interests, those acts harmed the only creditor "to whom the property of the corporation must go"—Fleet. *Olney*, 18 A. at 181.

At most, EPJC could argue that the $200,000 consulting fee should be paid into a constructive trust for the benefit of Anson's creditors. However, Fleet's remaining claims against Anson supercede EPJC's claims and would easily consume the entirety of the trust. Again, as a court sitting in equity, this Court will not alter the reality of EPJC's dilemma and relieve it of its business mistakes. This Court cannot rescue EPJC from its position as a hopelessly subordinated creditor of a manufacturer that failed to turn a profit for the better part of a decade.

Finally, even if this Court determined that plaintiff was entitled to some damages, plaintiff has presented this Court with no measure of what those damages should be. Plaintiff seeks a judgment on this count against Considine in the amount of the two Superior Court judgments against Anson. But plaintiff has not even attempted to demonstrate how this sum relates to any profits gained by Consi-

dine's breach of duty. Furthermore, such an award would give plaintiff something it did not have before the October 1993 transaction: a money judgment against a solvent corporation. Plaintiff is in no worse position today than it was in the day before Fleet foreclosed on Anson. Therefore, this Court finds in favor of defendant Considine on Count IV and judgment shall be entered for him on that count.

## Judgment as a Matter of Law: Tortious Interference

Plaintiff also charges that Considine, Jacobsen, and C & J are liable to it for tortiously interfering with its Sales Contract with Anson. Spotlighting Considine and Jacobsen's negotiations with Fleet during the first ten months of 1993, plaintiff argues that defendants undermined Anson's ability to perform its part of the bargain with EPJC by gutting Anson of its operating assets. Defendants moved for judgment as a matter of law on this count at the close of the evidentiary stage of the trial. The Court reserved determination of the motions. The jury returned a split verdict, finding in favor of plaintiff and against Considine and C & J, but concluding that Jacobsen was not liable on this count. Defendants Considine and C & J persisted with their motions. Because plaintiff has not challenged the jury's verdict in favor of Jacobsen, the Court will address only the motions of Considine and C & J.

### A. Standard of review

■■■■ Defendants seek judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50. Rule 50(a)(1) provides that

> [i]f during trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a

claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.

Fed.R.Civ.P. 50(a)(1). The movant may renew that motion following the return of the jury verdict "by filing a motion no later than 10 days after entry of judgment." *Id.* 50(b). When considering such motions, the Court views the evidence in the light most favorable to the non-moving party and draws all reasonable inferences from that evidence in that party's favor. *See Collazo–Santiago v. Toyota Motor Corp.*, 149 F.3d 23, 27 (1st Cir.1998). The motion may only be granted "if the evidence, viewed from this perspective, 'would not permit a reasonable jury to find in favor of the plaintiff[ ] on any permissible claim or theory.'" *Andrade v. Jamestown Hous. Auth.*, 82 F.3d 1179, 1186 (1st Cir. 1996) (quoting *Murray v. Ross–Dove Co.*, 5 F.3d 573, 576 (1st Cir.1993)). With this instruction in mind, the Court will address the substance of the motion.

### B. Elements of the cause of action

■■■■ The elements that comprise a cause of action for tortious interference with contractual relations under Rhode Island law are well-established. Plaintiff must prove that (1) a contract existed, (2) defendants knew of the contract, (3) defendants intentionally interfered with the contract, and (4) the interference caused plaintiff damages. *See Smith Dev. Corp. v. Bilow Enters., Inc.*, 112 R.I. 203, 308 A.2d 477, 482 (1973); *see also New England Multi–Unit Hous. Laundry Ass'n v. Rhode Island Hous. & Mortgage Fin. Corp.*, 893 F.Supp. 1180, 1191–92 (D.R.I. 1995). The Smith court explained that the requisite interference encompasses more than the encouragement of a breach of the contract, but includes any act "which retards, makes more difficult, or prevents performance, or makes performance of a contract of less value to the promisee." *Smith Dev. Corp.*, 308 A.2d at 482.

Traditionally, this cause of action was said to require a finding of malice. *See Local Dairymen's Coop. Ass'n v. Potvin*, 54 R.I. 430, 173 A. 535, 536 (1934). However, malice in this case means nothing more than "unjustified interference." *New England Multi–Unit Hous. Laundry Ass'n*, 893 F.Supp. at 1191; *see Smith Dev. Corp.*, 308 A.2d at 480. A defendant's ill-will toward a plaintiff has no bearing on this matter. *See Jolicoeur Furniture Co. v. Baldelli*, 653 A.2d 740, 753 (R.I.1995) (holding that interference can be legally malicious even if based on good motives, as long as it was unjustified). Proof that the interference was justified is a burden that the defendant bears. *See URI Cogeneration Partners, L.P. v. Board of Governors for Higher Ed.*, 915 F.Supp. 1267, 1289 (D.R.I.1996).

The elements of this tort, like those of all other intentional torts, includes a causation requirement. Proof of causation is a two-step process. Modern tort doctrine requires that plaintiff must establish both factual and proximate causation. *See* W. Page Keeton, *The Law of Torts* §§ 41–42 (5th ed.1984) (discussing both causation requirements). The most detailed discussion of the causation element for this tort is contained in a series of decisions dealing with intentional interference with prospective contractual relations, a sibling to the tort at issue here. The Rhode Island Supreme Court has ruled that the legal requirements for establishing these two torts are identical, with the exception that a plaintiff need not prove the existence of a contract when the interference claimed is with a prospective relationship. *See Mesolella v. City of Providence*, 508 A.2d 661, 670 (R.I.1986). In Mesolella, the Rhode Island Supreme Court expressly imposed upon a plaintiff the task of proving factual causation between the acts of the defendant and the damage suffered by the plaintiff. *See id.* at 671. The Court offered two versions of the test that must be satisfied. The plaintiff must prove either that "but for" the defendant's unjustified interference, the plaintiff would not have suffered injury, or that "it is reasonably probable that but for the interference" the plaintiff would not have suffered the injury. *Id.; see Russo v. Baxter Healthcare Corp.*, 140 F.3d 6, 10–11 (1st Cir.1998) (applying Rhode Island law and requiring proof of factual causation); *Wooler v. Hancock*, 988 F.Supp. 47, 49 (D.R.I.1997) (same); *L.A. Ray Realty v. Town of Cumberland*, 698 A.2d 202, 207 (R.I.1997) (same). Although causation is generally a matter left to the consideration of the jury, a court may properly intervene if plaintiff fails to adduce "more than a mere scintilla" of evidence on this vital element of the cause of action. *See Russo*, 140 F.3d at 12; *Peckham v. Continental Cas. Ins. Co.*, 895 F.2d 830, 837 (1st Cir.1990).

**C. Application of the legal standards**

This count fails as a matter of law because there is no evidence from which a reasonable jury could conclude that defendants' actions caused plaintiff any loss. Plaintiff's theory fails the but-for test of causation mandated by the Rhode Island Supreme Court. This defect is similar to faults found in the other counts before the Court. Because of EPJC's junior position among creditors and the impossibility, discussed above, of any future recovery from Anson, EPJC suffered no harm from the plan to gut Anson. Plaintiff cannot prove that but for defendants' abandonment of Anson, EPJC would have collected its commissions under the Sales Contract. To the contrary, even if there had been no transfer of assets, EPJC would have recovered nothing from Anson for the reasons outlined previously in this decision. Defendants C & J and Considine are entitled to judgment as a matter of law on Count III. Defendant Jacobsen is entitled to judgment also for the above reason and because of the jury's verdict.

*CONCLUSION*

For the foregoing reasons, this Court rules in favor of all defendants on Counts

I, II, and IV. Defendants' Motion for Judgment as a Matter of Law on Count III is granted. The Clerk shall enter judgment for defendants C & J and Little Bay on Counts I and II; for defendants C & J, Considine, and Jacobsen on Count III; and for defendant Considine on Count IV.

It is so ordered.